## Talbott, Auditor of Public Accounts, v. Kentucky State Board of Education et al.

(Decided June 24, 1932.)

(As Modified on Denial of Rehearing September 30, 1932.)

R. W. KEENON, GUY BRIGGS, CLIFFORD E. SMITH, and MORRIS & JONES for appellant.

BAILEY P. WOOTTON, Attorney General, and OVERTON S. HOGAN, Assistant Attorney General, for appellees.

OPINION OF THE COURT BY JUDGE REES—Reversing.

The General Assembly of Kentucky at its 1930 session passed an act appropriating annually out of the general fund of the state treasury the sum of $1,250,000 to be expended and administered under the direction and supervision of the state board of education. Chapter 36, Acts 1930. The act provides that the money therein appropriated shall be known and designated as the fund for the equalization of educational opportunities in this commonwealth, and equalizaton of educational opportunities is declared to mean "the raising of the level of expenditures per pupil for educational purposes in school districts where the level of educational opportunities is below the level or standard fixed and prescribed by law and by the State Board of Education as hereinafter provided." Section 2.

Only a board of education that has levied the maximum school tax permitted by law and has had its budget and salary schedule approved by the state board of education has the privilege of applying for aid from

the fund appropriated by the act. Section 4 of the act reads:

"If the State Board of Education, upon investigation, finds that any applicant for an apportionment from the fund created by this Act, by using all of the State Per Capita and one-half of its local revenue, cannot employ its teachers for a minimum of seven months and pay them a minimum salary of $75 per month, estimating on the basis of one teacher for every forty children of school age, then the State Board of Education shall distribute and pro rate from the funds created by this Act sufficient revenue to enable such board of education to employ its teachers for a minimum term of seven months and pay salaries based upon a minimum of $75 per month with additional amounts for high school and college training as provided in the salary schedule adopted by the local board of education and approved by the State Board of Education, estimating one teacher for each forty pupils in the census."

It is further provided (sections 5, 8) that the funds apropriated shall be prorated on or before February 1 of each year by the state board of education to each board of education meeting the provisions of the act, and that the money appropriated by the act shall be set apart in the state treasury to the credit of the state board of education, and the state treasurer, as treasurer of the state board of education, shall hold the same inviolate and as a separate fund and shall pay out such money on warrants of the auditor of public accounts, who shall issue such warrants only on requisitions signed by the chairman of the state board of education.

At a meeting of the state board of education held on January 27, 1932, applications of a number of local boards of education throughout the state for aid from the fund provided by the act were approved, and allotments totaling $790,942.94 were made. The chairman of the board was directed to draw a requisition upon the auditor of public accounts for the amounts allotted to the various local boards of education, which was done. The auditor of public accounts declined to issue a warrant or warrants upon the state treasurer for the sum requested, or any part thereof, and the state board of education thereupon brought this action in the Franklin circuit

court in which a mandatory injunction was sought to require him to draw a warrant or warrants upon the state treasurer for the sum of $790,942.94.

An answer in four paragraphs was filed; the first paragraph being a denial that the defendant wrongfully or illegally refused to issue a warrant or warrants. In the second paragraph it is alleged that there was a deficit in the general fund of several million dollars at the time the warrants were requested. In the third paragraph it is alleged that chapter 36 of the Acts of 1930 attempts to create a debt in violation of sections 49 and 50 of the Constitution, and is therefore void; and in paragraph 4 it is alleged that the act violates section 186 of the Constitution, in that, if the fund created by the act is distributed to the boards of education of the various counties applying for it, the school fund will not be distributed upon a pro rata basis as contemplated by that section of the Constitution. A demurrer to the second, third, and fourth paragraphs of the answer was sustained, and, the defendant having declined to plead further, a judgment was entered directing him to issue a warrant or warrants for the amount prayed for in the plaintiff's petition.

On this appeal prosecuted by J. Dan Talbott, auditor of public accounts, it is argued that chapter 36 of the Acts of 1930 contravenes sections 3, 49, 50, 59, 171, 180, 181, and 186 of our Constitution and is void. We have concluded that the act violates section 186 of the Constitution, and it therefore becomes unnecessary to discuss or determine the question of its constitutionality in other respects.

Section 186 of the Constitution reads in part:

"Each county in the Commonwealth shall be entitled to its proportion of the school fund on its census of pupil children for each school year; and if the pro rata share of any school district be not called for after the second school year, it shall be covered into the treasury and be placed to the credit of the school fund for general apportionment the following school year."

The school fund which this section provides shall be distributed annually to the counties on a pro rata basis is composed of all sums produced by taxation or otherwise for common school purposes, and the interest and

dividends of the fund set apart by section 184 of the Constitution, which reads:

"The bond of the Commonwealth issued in favor of the board of education for the sum of one million three hundred and twenty-seven thousand dollars ($1,327,000.00) shall constitute one bond of the Commonwealth in favor of the board of education, and this bond and the seventy-three thousand five hundred dollars ($73,500.00) of the stock in the Bank of Kentucky, held by the board of education, and its proceeds, shall be held inviolate for the purpose of sustaining the system of common schools. The interest and dividends of said fund, together with any sum which may be produced by taxation or otherwise for purposes of common school education, shall be appropriated to the common schools, and to no other purpose."

The genesis of section 184 was section 1 of article 11 of the third Constitution adopted in 1850, which provided that the capital of the fund known as the "Common School Fund," consisting of certain specified items together with any sum which might be raised thereafter in the state by taxation or otherwise for purposes of education, should be held inviolate for the purpose of sustaining a system of common schools. Section 1 of article 11 of the Constitution of 1850 then provided:

"The interest and dividends of said funds, together with any sum which may be produced for that purpose, by taxation or otherwise, may be appropriated in aid of common schools, but for no other purpose."

In 1837 the federal government distributed its surplus revenue to the states and the bond executed by the state of Kentucky to the board of education referred to in article 11 of the Constitution of 1850, and in section 184 of the present Constitution was in part for the sum thus received by this state. In 1892 the federal government made a return of direct taxes to the state amounting to $606,641.03. The receipt of this sum was anticipated by the Constitutional Convention of 1891, and section 188 of the Constituton resulted, which reads:

"So much of any moneys as may be received by the Commonwealth from the United States, under

the recent act of congress refunding the direct tax, shall become a part of the school fund, and be held as provided in sec. 184; but the general assembly may authorize the use, by the Commonwealth, of the moneys so received, or any part thereof, in which event a bond shall be executed to the board of education for the amount so used, which bond shall be held on the same terms and conditions, and subject to the provisions of sec. 184, concerning the bond therein referred to.''

As a matter of fact, the funds represented by the bonds referred to in sections 184 and 188 of the Constitution do not exist, since the principal has been spent by the state. A tax is levied to cover the interest on the bonds, and the proceeds are paid to the state board of education. The result is that the Legislature is compelled to levy taxes at least to that extent for common school purposes.

By section 183 of the Constitution it is provided that ''the general assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the state,'' and it has been held that this section leaves to the General Assembly the discretion of determining what is an efficient common school system. Prowse v. Board of Education, 134 Ky. 365, 120 S. W. 307; Elliott v. Garner, 140 Ky. 157, 130 S. W. 997. Section 183 does not require that the cost of maintaining an efficient system of schools shall be paid by the state, but, in carrying out its provisions, the General Assembly has provided that 69 per cent of the proceeds of all ad valorem taxes levied for state purposes shall be used for the support of the common schools. To supplement the per capita apportionment of the state school fund, county levies for school purposes of not less than 25 cents nor more than 75 cents on each $100 of taxable property in the territory affected are required. Section 4399a-8, Kentucky Statutes.

In sectons 4364 and 4434a-14a, the General Assembly has impliedly defined an efficient system of common schools as one in which a school is kept in each subdistrict for seven or more successive months by a qualified teacher who receives a salary of not less than $75 a month. The state school fund when distributed on a pro rata basis is not sufficient to maintain schools of that standard throughout the state, and it is necessary to

supplement these funds by local taxation. Even then in many counties the standard cannot be maintained, although the maximum rate of taxation permitted by statute is levied for local school purposes. It was to correct this inequality and to enable such counties or districts to maintain their schools for seven months and pay their teachers the minimum salary that chapter 36 of the Acts of 1930 was enacted. The purpose was laudable, and the end sought to be achieved is a desirable one, but section 186 of the Constitution bars the door to such legislation.

The General Assembly, even under the present Constitution, may provide for a system of schools which it deems efficient by levying a tax sufficient for that purpose when the proceeds are distributed on the pro rata basis, or by raising the limit of the rate of taxation that may be levied for local school purposes. Its power in either respect is not limited by the Constitution. The act of 1930 is a palpable violation of the constitutional provision for the pro rata distribution of state school funds. Suppose the Legislature repealed that portion of the statute appropriating 69 per cent of all ad valorem taxes to the school fund and permitted all state taxes to be covered into the general fund, could it be successfully argued that 69 per cent or even a larger portion of the general fund could then be appropriated for the purpose set out in the act in question and distributed to the various counties on an unequal basis? If that can be done then sections 184 and 186 of the Constitution are meaningless in so far as they require all sums which may be produced by taxation, or otherwise, for purposes of common school education to be distributed to the counties on a pro rata basis. It is immaterial that money produced by taxation is appropriated for school purposes after the tax is levied or the money collected. It becomes, as soon as the appropriation is made, a part of the school fund, and its distribution is controlled by these sections of the Constitution. Calling it a fund for the equalization of educational opportunities does not change its character. It is spent in precisely the same manner and for the same purposes as other state school funds, except the method of distribution is changed.

The construction we have placed upon the controlling constitutional provisions was never questioned until the passage of the 1930 act, but on the contrary it

has been accepted as the correct construction by the courts, the Legislature, lawyers, and laymen alike. Recognizing the inhibitions contained in section 186 against the distribution of state school funds on any basis other than a pro rata one, the General Assembly in 1920 submitted to the voters for ratification a constitutional amendment which would have enabled it to achieve the purpose sought to be accomplished by the act under consideration. The voters, probably inadvisedly, failed to ratify the amendment.

In 1920, the Governor, pursuant to authority conferred upon him by the General Assembly, appointed a commission of five persons known as the Kentucky Educational Commission to make a survey of the public educational system of the state. Eminent lawyers and educators were appointed members of the commission. In an exhaustive and carefully prepared report, the commission said relative to the distribution of state school funds on a per capita basis:

> "A method of distributing state school funds that thus ignores differences in financial resources, ignores differences in the grade and in the quality of the schools although there is equal willingness on the part of the people to make sacrifices for them, and ignores the state's responsibility to provide equal educational opportunities of a satisfactory standard for all the children of the commonwealth, ought not to be longer tolerated. Sound policy requires that these differences be taken into account in distributing state school funds. Kentucky is, however, tied by the constitution to this unwise and antiquated method of distributing state school funds."

Further along in the report it was said:

> "Nevertheless, to reduce at this time, even to a limited extent, existing inequalities in school opportunities is simple justice and will confer inestimable benefits on the rural children of the less favored counties. But nothing at all can be done because the people failed to ratify Constitutional Amendment Number Two."

Under an act of the General Assembly of 1922 (chapter 115, Acts 1922), the Efficiency Commission of Kentucky was created for the purpose, among others, of

inquiring into, reporting, and making recommendations "concerning every branch and arm of the State Government that is contributed to or supported in whole or in part by State funds or that performs judicial, executive, legislative or ministerial functions." Section 3. The Efficiency Commission filed its report on January 1, 1924. In the general statement preceding the report proper, under the heading, "Constitutional Obstacles to Progress," the following is listed: "Limitations as to the apportionment of school funds. The methods of apportioning state school funds universally recognized by authorities to be essential to proper educational development are impossible under the present Constitution." In that part of the report dealing with the educational system of the state it was said: "Of paramount importance, but unfortunately impossible under the present Constitution, is a complete revision of the system of allotting the State Common School Fund. The effect of the present laws is to create a deplorable degree of discrimination between the opportunities afforded the pupils of the different districts. What is needed is to treat the educational interests of the State as one great whole. The Common School Fund should be so administered as to carry out this object. Those districts which are poorer in local income need, from the standpoint of the State as a whole, a stimulus in the direction of better educational effort greater than is required where the local income is large. The State school fund should be distributed in direct proportion to the needs and to the efforts which the local districts are making to improve their situation. It is unfortunate that an amendment to the State Constitution which would have gone far to accomplish these ends was defeated by the very portions of the State which would have benefited most by such an arrangement." Report of the Efficiency Commisson of Kentucky, vol. 2, p. 277.

While the precise question here presented has never been before this court, all of the cases in which section 186 and related sections of the Constitution have been construed are in harmony with and point unerringly to the conclusion we have reached in the instant case. Crabbe v. Board of Trustees, 132 Ky. 478, 116 S. W. 706; Louisville School Board v. Superintendent of Public Instruction, 102 Ky. 394, 43 S. W. 718; Louisville School Board v. McChesney, 109 Ky. 9, 58 S. W. 427; Dawson v. Lee, 83 Ky. 49; Auditor v. Holland, 14 Bush 147;

Halbert v. Sparks, 9 Bush 259; Board of Trustees of Morganfield Public School v. Thomas, 15 S. W. 670, 12 Ky. Law Rep. 832. In Auditor v. Holland Case, supra, an act of the General Assembly was declared unconstitutional as in violation of section 1 of article 11 of the Constitution of 1850. The act authorized the common school commissoners of certain counties to draw from the state treasury the amount and bonded surplus of school funds in the state treasury to the credit of the counties upon being directed so to do by order of their respective county courts, but it provided that each commissioner should execute covenant to the commonwealth that he would safely keep, invest, pay out, or otherwise dispose of the fund for common school purposes as the court of claims of his county might order. In the opinion it was said:

"Ever since the adoption of the present constitution the law has made it the duty of the superintendent of public instruction to apportion each year the interest and dividends upon the school-fund and the proceeds of taxes levied for educational purposes, among the whole number of children in the state within the school-ages, as fixed by law, and to place to the credit of each county a sum bearing the same proportion to the whole fund, to be distributed, that the number of school-children in such county bears to the whole number of such children in the state. This was done in obedience to the proviso to section 1 of article 11 of the constitution, which provides, among other things, 'that each county shall be entitled to its proportion of the income' of the school-fund."

And further:

"That the system of common schools provided for by the constitution was intended to be general, governed and aided in all parts of the state in the same way and to the same extent, does not admit of doubt. Not only was the system intended to be general and uniform, but it was intended to be controlled by the legislature.

"The act in question, even if it could be construed to require the county courts to apply the fund directed to be paid to their school commissioners in aid of common schools in their respective counties, does not require that it should be distributed ratably

among the several districts, and there is nothing in the act to prevent the whole from being turned over to a single district."

The fund referred to in the act of 1930 as the equalization fund is part of the school fund described by section 184 of the Constitution as consisting of the proceeds of bonds of the commonwealth "together with any sum which may be produced by taxation or otherwise for purposes of common school education," and must be distributed in the manner prescribed by section 186. It is derived from the same source as other state school funds raised directly by the state, and eventually is devoted to the same purpose, the payment of teachers' salaries, though not distributed in accordance with the constitutional provision on the subject. Changed conditions may call for legislation of this character, but the solemn mandate of section 186 of the Constitution forbids.

The argument is advanced that the construction herein reached would require that the taxes levied by counties, municipalities, and other subdivisions of the state for common school purposes should be distributed as a part of the state school fund on a per capita basis, and also would destroy the right of the state to appropriate funds for the maintenance of the state university and the state normal schools.

Section 186 of the Constitution deals with and applies exclusively to common school funds heretofore or that hereafter may be levied and collected by the commonwealth in its sovereign capacity and from the state at large. It has no application to public school funds that are levied, collected, and raised by subdivisions of the state for the purpose of supplementing the state school fund for their exclusively local purposes. Although such supplemental local tax may become in a sense a state tax after it has been provided for and collected by the local community, the state has no right to take charge of it and distribute it throughout the state among the common schools. It is a state tax in the sense that the local state institutions are the beneficiaries thereof through the exercise of delegated local power and authority conferred upon such tax-raising districts, and it is in that sense only that such local taxes were declared to be state taxes in the cases of North Vernon Lumber Company v. City of Louisville, 163 Ky. 467, 173 S. W. 1120; Board of Education of Jefferson County v.

Board of Education of City of Louisville, 182 Ky. 544, 206 S. W. 869; Moss v. City of Mayfield, 186 Ky. 330, 216 S. W. 842; Whitt v. Wilson, 212 Ky. 281, 278 S. W. 609; Commonwealth ex rel. Baxter v. Burnett, 237 Ky. 473, 35 S. W. (2d) 857; and others of like tenor.

The argument that the construction herein reached would destroy the right of the state to appropriate funds for the maintenance of the state university and the state normal schools, which is based upon the grounds that the per capita plan is not followed and observed in such appropriations, is fallacious because these institutions were excepted from the operation of the provisions of section 184 of the Constitution limiting the right of the Legislature to raise or appropriate funds for educational purposes, and consequently were excepted from the operation of the provisions of section 186 of the same instrument. The excluding proviso in section 184 reads: "The tax now imposed for educational purposes, and for the endowment and maintenance of the Agricultural and Mechanical college, shall remain until changed by law." In construing this proviso in Agricultural and Mechanical College v. Hager, 121 Ky. 1, 87 S. W. 1125, 1127, 27 Ky. Law Rep. 1178, this court said:

"Therefore we find the section of the Constitution dealing particularly with this subject placing forever beyond the reach of any other use the principal sum and its investments which had been raised and received for educational purposes. It was likewise made impossible that the annual contributions of taxes for school purposes should be even temporarily diverted from their intended end. It was next so provided that the state could not embark in any further partnership educational enterprises, at least until the matter had been first approved by the people. In drawing the lines for safety about these matters which had been so disturbed and endangered, it was seen that the terms employed were so strict that possibly other institutions of learning belonging to the state, and forming no less a part of its system of popular education, might be hampered by a literal construction of the words. Hence the proviso that forms the exception to what had been said—that rescued what followed from what had gone before. We have seen that these institutions were as if named in the excepting clause. Therefore, as to them, the Legislature was left free to continue,

and, indeed, they were in terms continued by the Constitution itself, till such time as it might be 'changed by law.' It could scarcely be claimed that the convention had the thought, or that the language used, in view of the conditions, admits of it, that for all the other means of public education the convention intended that the Legislature might deal with them as varying conditions seemed to demand, while of these particular institutions, also essentially and entirely educational, and so long established and maintained by the state as to be no longer experiments, the Legislature might not provide for them as their exigencies might seem to require from time to time. The language does not so restrict the purpose. It would have been unnatural and inharmonious with the general plan disclosed by the whole section. The taxes imposed for those institutions were to remain 'until changed by law,' implying plainly that existing appropriations were continued and further appropriations were allowed, or all might be lowered or discontinued in part or entirely, as the lawmaking department of the government might deem most expedient."

In Marsee v. Hager, 125 Ky. 445, 101 S. W. 882, 31 Ky. Law Rep. 79, it was held that the state normal schools were included by the terms of this proviso of section 184 of the Constitution.

For the reasons indicated, we are of the opinion that the auditor properly refused to issue his warrant, and that the lower court erred in sustaining the demurrer to paragraph 4 of his answer. The judgment is therefore reversed, and the cause remanded, with directions to overrule the demurrer.

The whole court sitting, all concurring.