**Vyda FANNIN, et al., Appellants,**

v.

**Barbara WILLIAMS, as State Librarian of the Commonwealth of Kentucky, et al., Appellees.**

Supreme Court of Kentucky.

July 6, 1983.

Respondents-Appellees Petitions for Rehearing or Modification Denied Sept. 15, 1983.

Jennifer B. Coffman, Lexington, for appellants; John J. Slattery, Jr., Gen. Counsel, Kentucky Educ. Ass'n, Louisville, of counsel.

B. Keefe Montgomery, Theodore H. Amshoff, Jr., Louisville, Monte Gross, Dept. of Finance, Frankfort, for appellees; Patrick Monaghan, Gen. Counsel, Catholic League for Religious and Civil Rights, Milwaukee, Wis., of counsel.

LEIBSON, Justice.

This is a declaratory judgment action challenging the validity of KRS 171.215, a statute supplying textbooks to children in the state's nonpublic schools (Kentucky Acts, 1978, Ch. 139, effective June 17, 1978).

The complaint attacked the nonpublic school textbook statute as unconstitutional under sections 3, 5, 171, 180, 184, 186 and 189 of the Kentucky Constitution; as an unconstitutional delegation of legislative power to administrative officials; and as unconstitutional under the First and Fourteenth Amendments to the Constitution of the United States. On motion for summary judgment, the trial court dismissed all of these grounds.

This summary judgment was appealed. The appeal was transferred from the Court of Appeals to the Supreme Court pursuant to CR 76.18.

The title of the statute in question is: "AN ACT relating to textbooks and making an appropriation therefor."

The text of the statute is as follows: SECTION 1. A NEW SECTION OF KRS CHAPTER 171 IS CREATED TO READ AS FOLLOWS:

"(1) The department of libraries shall purchase textbooks from publishers whose books have been adopted by the

state textbook commission for distribution without cost to pupils attending grade one (1) through grade twelve (12) of the state's nonpublic schools which have been accredited by the state department of education.

(2) The chief school administrator of each eligible school may file a requisition with the state librarian for the books needed for the next ensuing school term. Textbooks eligible for distribution by grade level or subject shall conform to the schedule in use by the state board of education for distribution to the public schools.

(3) The state librarian shall develop rules and regulations governing the purchase, requisition, distribution, assignment to students, care, use and return of textbooks, and a plan for permanently labeling the textbooks as the property of the department of libraries. The rules and regulations shall provide for the allocation of textbooks in a manner reflecting, and not to exceed the expressly limited appropriation to fund the Act. The rules and regulations shall be developed in consultation with the department of education and shall conform, within statutory limits, to the rules and regulations already established by the state board of education.

(4) All textbooks purchased under the provisions of this Act are the property of the state. Each school administrator obtaining books through the department of libraries is custodian of the books in his school. He shall issue the books to the students according to the rules and regulations formulated by the state librarian.

(5) Funds appropriated by the general assembly to the department of libraries for this purpose shall not be expended for any textbooks which present a particular religious philosophy and shall not be considered as or commingled with common school funds and shall be allocated each year to the nonpublic school students as provided by rule and regulation of the department of libraries to the extent allowed by the appropriation provided in Section 2 of this Act.

Section 2. To carry out the provisions of this Act, there is appropriated to the department of libraries $25,000 for fiscal year 1978–79, which sum shall not lapse but shall be carried forward to the next fiscal year."

■ Because we have reached the conclusion, albeit reluctantly, that regardless of its salutory purpose the statute violates the Kentucky Constitution, it would extend this opinion unnecessarily to examine all of the complaints against the constitutionality of the statute and the responses thereto. It is only necessary to deal with the points that compel this conclusion.

Section 171 of the Kentucky Constitution specifies that "Taxes shall be levied and collected for public purposes only." Is the appropriation of tax money for educating children in nonpublic schools "for public purposes?" These textbooks are for "distribution without cost to pupils attending grade one (1) through grade twelve (12) of the state's nonpublic schools." Section 2 of the Act appropriates $25,000 for that purpose.

KRS 158.030 defines a "common school." It is "an elementary or secondary school of the state supported in whole or in part by public taxation." It is a term synonymous with "public" school. *Sherrard v. Jefferson County Board of Education*, 294 Ky. 469, 171 S.W.2d 963 (1943). It is a term treated as mutually exclusive with nonpublic school by the provisions of KRS 159.030, which require compulsory attendance at public school for school age children with certain exceptions, one of which is a child "enrolled and in regular attendance in a private or parochial regular day school approved by the state board of education." It is these "private or parochial schools" whose services are aided and assisted by the statute in question.

Under the terms of the statute in question, these "nonpublic schools" obtain textbooks for children in their schools on requisition filed by the chief school administrator of each eligible school with the state librarian. The school administrator is then "the

custodian of the books in his school." He is directed to issue the books to the students according to the rules and regulations formulated by the state librarian in consultation with and conformity to rules and regulations established by the State Board of Education.

The only issue for purposes of Section 171 is whether the money is being used for a public purpose. This depends on whether the "use is a public one and is calculated to aid all the people in the state." *Kentucky Building Commission v. Effron,* Ky., 310 Ky. 355, 220 S.W.2d 836 (1949). Nonpublic schools are open to selected people in the state, as contrasted with public schools which are open to "all people in the state."

Section 184 of the Kentucky Constitution provides:

"No sum shall be raised or collected for education other than in common schools until the question of taxation is submitted to the legal voters, and the majority of the votes cast at said election shall be in favor of such taxation. . . ."

In *Brown v. Board of Education of Newport,* 108 Ky. 783, 57 S.W. 612 (1900), we said:

". . . (T)he text of (Section 184) shows clearly that the intention was to prohibit the collection of any taxes to any extent for educational purposes other than common schools, without the consent of the people."

The federal constitution is silent on the subject of education, leaving this most important function to the several states. Our state constitution provides for and regulates this function primarily under the title, "Education," Sections 183–189 inclusive. These sections start with the requirement that the General Assembly "provide for an efficient system of common schools throughout the state." They end with the requirement that "no portion of any fund or tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by, or in aid of, any church, sectarian, or denominational school." A fair reading of these seven sections of the constitution compels the conclusion that money spent on education is to be spent exclusively in the public school system, except where the question of taxation for an educational purpose has been submitted to the voters and the majority of the votes cast at the election on the question shall be in favor of such taxation. Kentucky Constitution, Section 184, *supra.*

The statute in question seeks to evade constitutional limitations by a series of devices, which do more to point up the constitutional problems than to avoid them. These include:

(1) Directing the department of libraries to purchase and distribute the textbooks instead of the department of education. But the textbooks shall conform to the schedule in use by the state board of education and the rules and regulations for their purchase and use shall be developed in consultation with, and conform to those established by, the state board of education.

(2) The statute states the books are for distribution to the pupils. But it is the private or parochial school administrator who is charged with their requisition, their custodial care, their use and their return.

(3) The textbooks are to be purchased from money appropriated by the general assembly rather than the common school fund. But it is no less public money from public taxes.

The framers of our Constitution did not intend for the legislature to spend public money to support private schools by these devices.

Section 3 of the Kentucky Constitution prohibits payment of public money "to any man or set of men, except in consideration of public services."

If we were to arbitrarily assume, contrary to the facts, that the statute benefits only the children in the nonpublic schools, to the exclusion of any benefit to the function of the schools, if we were able to completely separate the two, we would then be in conflict with Section 3 of the Constitution. When the statute is confronted foursquare, the dilemma is insolvable.

In *Barker v. Crum,* 177 Ky. 637, 198 S.W. 211 (1917), the Court ruled that certain students were receiving an exclusive privilege without rendering a public service, so as to violate Section 3 of the Kentucky Constitution, under a law which provided that a certain number of students from each county would receive free tuition, room and board and travel expenses at the state university. The Court explained the language of Section 3: "If the privilege granted is not conferred on all alike it is special or exclusive, and therefore prohibited, unless granted in consideration of services theretofore rendered to the state." Id., 198 S.W. at 213.

Section 186 of the Kentucky Constitution provides:

"All funds accruing to the school fund shall be used for the maintenance of the public schools of the Commonwealth, and for no other purpose...."

In *Talbott v. Kentucky State Board of Education,* 244 Ky. 826, 52 S.W.2d 727 (1932), we specified that in defining "school fund," Section 186 includes "money produced by taxation (which) is appropriated for school purposes after the tax is levied or the money collected."

In *Talbott* we examined the interplay between Sections 184 and 186 and arrived at this definition of the constitutional limitation on the expenditure of funds for educational purposes:

"It is immaterial that money produced by taxation is appropriated for school purposes after the tax is levied or the money collected. It becomes, as soon as the appropriation is made, a part of the school fund, and its distribution is controlled by these sections of the Constitution. Calling it a fund for the equalization of educational opportunities does not change its character. It is spent in precisely the same manner and for the same purposes as other state school funds, except the method of distribution is changed."

Section 189 of the Kentucky Constitution provides:

"No portion of any fund of tax now existing, or that may hereafter be raised or levied for educational purposes, shall be appropriated to, or used by, or in aid of, any church, sectarian, or denominational school."

As a device to avoid First Amendment consideration, the United States Supreme Court has reasoned that under a New York textbook statute books are furnished to and for the benefit of the children in private schools and not the schools themselves. *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

There are sharp factual differences between *Allen* and the present case. The book distribution scheme there was based on requests for textbooks filed by individual students, while the distribution scheme here is based on requests by the chief administrator of each eligible school.

But the important difference is legal, not factual. In *Allen,* the Court decided whether the statute in question violated the seven words in the "establishment of religion" clause in the First Amendment to the United States Constitution. The problem in this case is not whether the challenged statute passes muster under the federal constitution as interpreted by the United States Supreme Court, but whether it satisfies the much more detailed and explicit proscriptions of the Kentucky Constitution. It does not.

The essence of the child benefit argument is that the aid provided flows directly and exclusively to the child and only indirectly, if at all, to the parochial school. Obviously the statute benefits *both* the children and the private schools who otherwise must make other arrangements for the children to get books. This theory has been considered and rejected in *Sherrard v. Jefferson County Board of Education, supra.* Specifically, *Sherrard* held tax money could not be used for the transportation of children attending private schools. This was later held permissible as a "legislation for the health and safety of our children" in *Nichols v. Henry,* 301 Ky. 434, 191 S.W.2d 930 (1945). But the underlying interpretation of the Constitution in *Sherrard* was

*expressly reaffirmed* as still the law where the purpose of the statute is educational, rather than health and safety. The purpose for textbooks is educational. *Sherrard* applies.

The statute in question seeks to avoid Section 184 of the Kentucky Constitution ("no sum shall be raised or collected for education other than in common schools") by directing that the expenditure shall be from the general fund, rather than school taxes. But Section 3 of the Kentucky Constitution prohibits payment of public money "to any man or set of men except in consideration of public services." If the exclusive purpose of the statute is to pay the expenses of children in private schools, this constitutional provision has been directly violated. Conversely, if the textbooks also aid in the functioning of the private schools themselves, the other constitutional provisions cited herein have been violated.

The people of Kentucky specified by the language of the Constitution in terms that are clear and unmistakable that the type of expenditure authorized by the statute in question should be unconstitutional. If the people of Kentucky wish to change their position in this matter, it is their right to do so.

As previously noted, Section 184 of the Kentucky Constitution provides that public money can be expended for education other than in common schools when a majority of the legal voters approve the expenditure by public referendum. If the legislature thinks the people of Kentucky want this change, they should place the matter on the ballot.

■ In sum, the Kentucky Constitution contemplates that public funds shall be expended for public education. The Commonwealth is obliged to furnish every child in this state an education in the public schools, but it is constitutionally proscribed from providing aid to furnish a private education. *Pollitt v. Lewis,* 269 Ky. 680, 108 S.W.2d 671 (1937). We cannot sell the people of Kentucky a mule and call it a horse, even if we believe the public needs a mule.

Unlike the statute extending transportation to children in nonpublic schools, it is impossible to classify textbooks as anything but educational. As such the statute must meet the constitutional limitations of those sections of the Constitution covering "Education."

One can argue, quite reasonably, that this statute (and any statute) furthering education is of public benefit, whether selective or not. Unfortunately, this approach begs the question, because the Constitution establishes a public school system and limits spending money for education to spending it in public schools.

Nor are we concerned with the reasons parents send their children to private schools, whether to provide a better secular education, to further their religious education, to avoid busing for desegregation, or whatever. The reason why the children are in private schools would have nothing to do with whether or not they should have free textbooks, if the state could provide them free textbooks in the first place. But the Kentucky Constitutional provisions that restrict spending money for education to public schools, restrict *where* and *how* public funds can be expended for education, not just *when* and *why*. So we cannot uphold the statute because we could find some public benefit in its purpose. It is constitutionally impermissible because of the manner in which it directs the expenditure of public funds for educational purposes, through nonpublic schools.

As we stated in *Commonwealth v. O'Harrah,* Ky., 262 S.W.2d 385, 389 (1953):

"Constitutional provisions, whether operating by way of grant or limitation, are to be enforced according to their letter and spirit, and cannot be evaded by any legislation which, though not in terms trespassing on the letter, yet in substance and effect destroy the grant or limitation. "In appraising the validity of the statute we must look through the form of the statute to the substance of what it does. The courts may not countenance an evasion or even an unintentional avoidance of our fundamental law."

The decision of the trial court is reversed. The case is remanded to the trial court to enter judgment in conformity with this opinion and granting appellants injunctive relief.

STEPHENS, C.J., and GANT, LEIBSON, STEPHENSON and VANCE, JJ., concur.

WINTERSHEIMER, J., files a dissent in which AKER, J., joins.

WINTERSHEIMER, Justice, dissenting.

I must respectfully dissent from the majority opinion because it is both out of step with the times and out of date with the law.

The program established by the Kentucky statute is identical to the textbook loan system upheld by the United States Supreme Court fifteen years ago in *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968).

The majority decision is out of step because it substitutes its judgment for that of the General Assembly. The legislature was within its rights when it recognized the right of individual students to public textbooks.

The result of the majority opinion is to deny the individual school students in the nonpublic schools of Kentucky the benefit of receiving loans of secular, state-approved books. I do not believe that the Constitution of this State, nor the United States, requires such a penalty for individual students and their parents.

The majority's reliance on *Sherrard v. Jefferson County Board of Education,* 294 Ky. 469, 171 S.W.2d 963 (1943), is misplaced. Private school pupils may benefit from public funds expended for a public purpose as long as the source of the tax money is outside of those taxes specifically levied for public schools. *Nichols v. Henry,* 301 Ky. 434, 191 S.W.2d 930 (1945). The funds appropriated by the legislature for this program never accrued to the public school funds and specifically must be kept separate therefrom pursuant to KRS 171.215(5). Consequently, Section 186 of the Kentucky Constitution does not prevent nonpublic school students from receiving the benefit of book loans.

The law in question does not violate Section 189 of the Kentucky Constitution because the program is funded from general revenues and it does not benefit any particular religious school.

Under the program developed pursuant to the Kentucky statute, the textbooks in question are loaned by the Department of Libraries to individual children attending nonpublic schools. The books are distributed by the particular school attended by the student. The school serves only as an agent for the loan program. The true legislative intent for the system is the distribution without cost to the pupils attending Grade 1 through Grade 12 of the nonpublic schools of this state. The textbooks remain the property of the state and must be allocated each year to the students of the nonpublic schools as funds permit.

The Department of Libraries receives annual reports on the inventory of books distributed for student use and controls the disposition of the books after the use is complete.

The law specifically provides that only those books adopted by the State Textbook Commission for Public Schools may be loaned to a student in a nonpublic institution. Therefore, a child can only receive a state-approved secular book as part of this program.

From a procedural point of view the trial judge did not commit reversible error in granting a summary judgment in favor of the state librarian on the issues of the First and Fourteenth Amendments to the Federal Constitution. The trial judge was confronted with no genuine issue of material fact so as to prevent the granting of a summary judgment on the delegation of power and federal constitutional questions.

KRS 171.215 does not violate the Establishment Clause and the librarian was entitled to a summary judgment as a matter of law on the First Amendment issue. In *Allen, supra,* the United States Supreme Court rejected an Establishment Clause argument to a New York textbook loan pro-

gram under which secular books were furnished free of charge to all students in nonpublic schools. The court said that merely making available to all children the benefits of a general program to lend school books free of charge is a financial benefit to the parents and children and not to the school. The Kentucky plan is identical to the New York system in that it distributes the books directly to the student and not to the school with the state retaining ownership. The nonpublic school is only the custodian of the books. Ownership is never transferred to the school. KRS 171.215(4).

The Kentucky program is in every material respect the same as the plan approved in *Allen.* The tests set up by *Allen* are:

(1) Is there a secular legislative purpose to the challenged enactment?

(2) Is the primary effect of the enactment one that neither advances nor inhibits religion?

The purpose of the Kentucky law is to provide secular state-approved books, thereby encouraging the use of the same books in all Kentucky schools. The State furthers its interests in preparing children to intelligently participate as citizens in a democracy. The primary effect of the Kentucky law neither advances nor inhibits religion. The Supreme Court has long recognized that religious schools pursue two goals, religious instruction and secular education. *Allen,* supra, 392 U.S. at 245, 88 S.Ct. at 1927.

Only secular books may be loaned under the law making the effect of the program totally secular in nature. No evidence has been presented that these books will be used for anything other than purely secular purposes. *See Meek v. Pittenger,* 421 U.S. 349, 362, 95 S.Ct. 1753, 1761, 44 L.Ed.2d 217 (1975). The Kentucky law, KRS 171.215, simply extends to nonpublic school children the same opportunity to borrow state-approved and state-owned books that is made available to public school students under KRS 157.100. Similar textbook plans have been upheld in *Meek,* supra, and *Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977). The Kentucky law is not in violation of the Establishment Clause of the First Amendment to the United States Constitution, and the summary judgment was proper.

It is fundamental that when textbooks are used by individual school children, they may be provided even if they are at times stored on private school property. Tribe, *American Constitutional Law* § 14-9 (1978).

The Kentucky law does not violate the Fourteenth Amendment. There is absolutely no evidence of any racial discrimination in this proposal.

The statute in question does not involve any unconstitutional delegation of power from the legislature to the State Librarian.

KRS 171.215 does not violate Section 3 of the Kentucky Constitution. There is no special privilege granted to any school, public or private. This is simply a legislative decision to share with all individual Kentucky school children the secular tools of education in order to satisfy the public purpose of creating an informed and educated citizenry regardless of the place or the teacher who made use of the books. The Kentucky law provides for the use of books by all people and is in absolute conformity with the true purpose of the Kentucky Constitution. As noted in *Kentucky State Board for Elementary and Secondary Education v. Rudasill,* Ky., 589 S.W.2d 877 (1979), there is a judicially-recognized public purpose in the education of youth so as to participate in a truly democratic society.

The law does not violate Section 5 of the Kentucky Constitution because it does not constitute a preference to any religious denomination, nor is it a contribution to the erection or maintenance of a place of worship or to the salary or support of any minister of religion. Similar to the bus transportation funds approved by this Court in *Nichols,* supra, the statutory plan does not offend the Kentucky Constitution § 5 simply because some of the individual beneficiaries may attend religious or nonpublic schools. The public purpose of achieving an educated citizenry is clearly a

permissible public objective as previously stated throughout this dissent. This Court has permitted public benefits to flow through a nonpublic channel where purely a secular purpose is assisted. *Kentucky Building Commission v. Effron,* 310 Ky. 355, 220 S.W.2d 836 (1949).

The law does not violate Section 171 of the Kentucky Constitution because the private and parochial schools are not directly benefited. Again the avowed public purpose of this law is to educate individuals, and as such it is a permissible objective which may be aided through secular services and materials. Many years ago, the United States Supreme Court approved of a similar program in Louisiana. *Cochran v. Louisiana State Board of Education,* 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1929). *Also see, Effron,* supra.

The Kentucky legislation does not violate Section 180 of the Kentucky Constitution because the funds provided to the Department of Libraries are not being used for any other purpose. There is no violation of the Constitution for general funds to be expended for a specific public purpose which might benefit the nonpublic school student. *See, Nichols,* supra.

KRS 171.215 does not violate Section 184 of the Kentucky Constitution because the appropriated funds come from the general revenues of the state. Section 184 implies that funds derived from levies for educational purposes be limited to those ends. Certainly funds collected for specific purposes can only be used for those purposes. On the other hand, taxes collected from other general revenue sources are not prohibited from being used for educational purposes. The statute in question does not offend Section 184 of the Kentucky Constitution in any way.

In the words of Mr. Justice Hugo Black of the United States Supreme Court, state power is no more to be used so as to handicap religions than it is to favor them. Parents may send their children to religious rather than public schools if the school meets the secular education requirements which the state has power to impose. The state must be neutral in its relations with groups of religious believers and nonbelievers. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1946).

The majority decision in this case is a giant step backward both in time and in the law. It results in arbitrary discrimination against individual children and their parents who choose to select nonpublic schools for educational purposes. The entire question has been answered by the United States Supreme Court in the Allen case more than fifteen years ago. This Court should not tamper with fundamental individual rights and resurrect a discredited doctrine of discrimination on the basis of individual educational preferences.

This Court should not disturb the legislative decision of the General Assembly. There is no constitutional infirmity in the challenged statutes. To strike down legislation solely because it incidentally benefits an individual's private choice is itself a violation of the freedoms guaranteed by our Federal and State Constitutions. *See, Tribe,* supra.

AKER, J., joins in this dissent.