RENDERED: FEBRUARY 19, 2026
TO BE PUBLISHED

# Supreme Court of Kentucky

### 2024-SC-0022-TG

COMMONWEALTH OF KENTUCKY, EX
REL. ATTORNEY GENERAL RUSSELL
COLEMAN

APPELLANT

ON MOTION TO TRANSFER
V.        COURT OF APPEALS NO. 2024-CA-0051
FRANKLIN CIRCUIT COURT NO. 23-CI-00020

COUNCIL FOR BETTER EDUCATION,
INC.; DAYTON INDEPENDENT BOARD
OF EDUCATION; JEFFERSON
COUNTY BOARD OF EDUCATION;
KENTUCKY BOARD OF EDUCATION;
ROBIN FIELDS KINNEY, IN HER
OFFICIAL CAPACITY AS INTERIM
COMMISSIONER OF THE KENTUCKY
DEPARTMENT OF EDUCATION;
SHARON PORTER ROBINSON, IN HER
OFFICIAL CAPACITY AS CHAIR OF
THE KENTUCKY BOARD OF
EDUCATION; AND GUS LAFONTAINE

APPELLEES

AND

### 2024-SC-0024-TG

GUS LAFONTAINE

APPELLANT

ON MOTION TO TRANSFER
V.        COURT OF APPEALS NO. 2024-CA-0064
FRANKLIN CIRCUIT COURT NO. 23-CI-00020

COMMONWEALTH OF KENTUCKY, EX                                    APPELLEES
REL. ATTORNEY GENERAL RUSSELL
COLEMAN; COUNCIL FOR BETTER
EDUCATION, INC.; DAYTON
INDEPENDENT BOARD OF
EDUCATION; JEFFERSON COUNTY
BOARD OF EDUCATION; KENTUCKY
BOARD OF EDUCATION; ROBIN
FIELDS KINNEY, IN HER OFFICIAL
CAPACITY AS INTERIM
COMMISSIONER OF THE KENTUCKY
DEPARTMENT OF EDUCATION; AND
SHARON PORTER ROBINSON, IN HER
OFFICIAL CAPACITY AS CHAIR OF
THE KENTUCKY BOARD OF
EDUCATION


**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

Since 1891, Kentucky has treated education not as policy, but as a constitutional mandate, challenged again and again and requiring fidelity. Uniquely and emphatically memorializing the constitutional protection of education funding, Kentuckians enshrined education as a fundamental right. *Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 206 (Ky. 1989). Soon after the constitution's ratification, this Court recognized the "prohibition against any practice which 'impairs the equal benefit of the common-school system' to all students." *Id.* (quoting *Major v. Cayce,* 33 S.W. 93, 95 (Ky. 1895)). The mandate implicates state education funds are for common schools and for nothing else.

2

In *Rose,* this Court struck down the entire K-12 system for failing Section 183's[1] "efficient" mandate; elevated education to a state constitutional fundamental right; defined adequacy; required substantial uniformity, equal opportunity, and adequate funding; and, importantly, reaffirmed the General Assembly alone bears the ongoing responsibility for building and maintaining that system. *Id.* at 208. The impact rippled from the "mansions of the city" to the "humble mountain home" as a challenge to have "all stand upon one level." *Id.* at 206. At the core of this challenge were the evils of waste, duplication, mismanagement, and political influence as barriers against an efficient school system. *Id.* at 210–13.

More than thirty years later in *Johnson,* the challenge to the 2021 Education Opportunity Account Act of HB[2] 563, the legislation in question was framed as a modest, parent-choice tool within the broader commitment to Kentucky's well-funded common schools. *Commonwealth ex rel. Cameron v. Johnson,* 658 S.W.3d 25, 29 (Ky. 2022). It failed to clear the Constitution's fiscal gate by creating a state tax-credit mechanism to subsidize non-common school education without the voter-approved tax that Section 184 requires. Relying on the "common schools" meaning established in KRS[3] 158.030, cases like *Pennybacker,*[4] and the plain text of Section 184, these were not merely

---

[1] Of the Kentucky Constitution

[2] House Bill

[3] Kentucky Revised Statutes

[4] Appropriation of public funds looks beyond whether the purpose is "for educational purposes" and at the recipient institution. This case turned on the

"private" funds, nor could they be harmonized with Section 183's efficiency mandate. Because its financing bypassed the restriction framers placed on school dollars—that public money may support education outside the common school system only with a Section 184-compliant, voter-approved tax, or if the beneficiary program could have been truly situated inside the common school system—HB 563 failed to pass constitutional muster. 658 S.W.3d at 43.

Most recently, in 2024, a legislatively referred constitutional amendment would have provided state funding for students outside the system of common schools. Amendment 2 was presented to Kentuckians and stated:

> To give parents choices in educational opportunities for their children, are you in favor of enabling the General Assembly to provide financial support for the education costs of students in kindergarten through 12th grade who are outside the system of common (public) schools by amending the Constitution of Kentucky as stated below?
> IT IS PROPOSED THAT A NEW SECTION BE ADDED TO THE CONSTITUTION OF KENTUCKY TO READ AS FOLLOWS:
> The General Assembly may provide financial support for the education of students **outside** the system of common schools. The General Assembly may exercise this authority by law, Sections 59, 60, 171, 183, 184, 186, and 189 of this Constitution notwithstanding.

Ky. H.B. 2, Reg. Sess. (2024) (emphasis added).

By a sweeping state-wide rejection in all 120 counties, Kentucky voters steeled the constitutional backbone of educational funding as strictly reserved for the common-school system. The result fortified that Sections 184 and 186 made clear the charter debate is a constitutional one, not merely legislative:

---

religious preference implications of § 189. *Univ. of Cumberlands v. Pennybacker*, 308 S.W.3d 668, 675 (Ky. 2010).

education funding requires either classification inside the common school system or voter consent.

With due respect for the General Assembly's extensive efforts to broaden educational opportunity, and mindful of the practical consequences of today's decision, we do not criticize those policy judgments nor substitute judicial discretion for legislative choice. Yet the Constitution binds us to a fixed standard. There is no question as to the General Assembly's exclusive task of providing "**each and every child** in this state . . . a proper and [] adequate education." *Rose*, 790 S.W.2d at 189–90 (emphasis added). As such, it is not the task before us to judge whether the General Assembly has since been successful at this task. Nor is it ours to project what might garner success. The issue we have on appeal is whether the General Assembly has met its threshold constitutional mandate: the affirmative duty to furnish an efficient common-school system anchored firmly with responsibility to protect education funding. These inter-related requirements distinguish Kentucky from its neighbors. With this constitutional yardstick — calibrated by precedent — the matter is measured.

## I. PROCEDURAL BACKGROUND

Appellee, Council for Better Education, Inc., sought a declaration of rights under KRS 418.040 in the Franklin Circuit Court against the Commissioner of Education and the Kentucky Board of Education and its chair, asking that court to find HB 9 violates Sections 183, 184, and 186 of the Kentucky Constitution. Appellant, Gus LaFontaine, an applicant for approval

5

of a charter school in Madison County, and Attorney General Cameron were both permitted to intervene as defendants to defend the constitutionality of the statute. The Franklin Circuit Court ruled that HB 9 violated Section 183 because "the challenged legislation is not consistent with the constitutional requirement for an efficient system of common schools," and that "the use of tax dollars to support charter schools violates Sections 184 and 186 of the Kentucky Constitution." The circuit court enjoined "[t]he Commonwealth of Kentucky, the Kentucky Department of Education, the Kentucky Board of Education and all officers, employees, agents, and persons acting in concert with them, including [Appellant] Lafontaine, his agents and employees" "from implementing the provisions of [HB 9] and from distribution or expenditure of any tax dollars to charter schools under that statute."

The Commonwealth of Kentucky, *ex rel.* Attorney General Daniel Cameron (now Russell Coleman) and Mr. LaFontaine each filed an appeal of the Franklin Circuit Court's decision. The Commonwealth and Mr. LaFontaine each separately asked this Court to transfer the case directly to its docket. Appellees responded in agreement that transfer was appropriate. This Court granted the motions to transfer.

## II. ANALYSIS

Despite the plethora of policy considerations the parties and amici curiae have confronted us with, we are ultimately tasked with answering one question and one question only: Does HB 9 violate the Kentucky Constitution? More specifically, we must determine whether the charter schools envisioned in HB 9

6

actually are a "common school" as contemplated by Sections 183 and 184 as well as a "public school" as contemplated by Section 186 of the Kentucky Constitution.

## A. The Constitutional Yardstick

We begin this constitutional analysis at its natural starting point — by reviewing the language of the Constitution. Section 183 — General Assembly to provide for school system — states:

> The General Assembly shall, by appropriate legislation, provide for an **efficient system of common schools** throughout the State.

(emphasis added). Section 184 — Common school fund -- What constitutes -- Use -- Vote on tax for education other than in common schools — states:

> The bond of the Commonwealth issued in favor of the Board of Education for the sum of one million three hundred and twenty-seven thousand dollars shall constitute one bond of the Commonwealth in favor of the Board of Education, and this bond and the seventy-three thousand five hundred dollars of the stock in the Bank of Kentucky, held by the Board of Education, and its proceeds, shall be held inviolate for the purpose of sustaining the system of common schools. The interest and dividends of said fund, together with any sum which may be produced by taxation or otherwise for purposes of common school education, shall be appropriated to the common schools, and **to no other purpose**. No sum shall be raised or collected for education **other than in common schools** until the question of taxation is submitted to the legal voters, and the majority of the votes cast at said election shall be in favor of such taxation: Provided, The tax now imposed for educational purposes, and for the endowment and maintenance of the Agricultural and Mechanical College, shall remain until changed by law.

(emphasis added). Section 186 — Distribution and use of a school fund — states:

> All funds accruing to the school fund shall be used for the maintenance of the **public schools** of the Commonwealth, **and for**

7

**no other purpose**, and the General Assembly shall by general law prescribe the manner of the distribution of the public school fund among the school districts and its use for public school purposes.

(emphasis added). "Common schools" and "public schools" are not defined in the Kentucky Constitution. KRS 158.030(1) defines "common school" as

an elementary or secondary school of the state supported in whole or in part by public taxation. No school shall be deemed a "common school" or receive support from public taxation unless the school is taught by a certified teacher for a minimum school term as defined by KRS 158.070 and **every** child residing in the district who satisfies the age requirements of this section has had the privilege of attending it.

(emphasis added). As the circuit court below us pointed out, this definition was substantially the same when the current Kentucky Constitution was adopted in 1891.

Under the General Assembly's own definition of common schools, charter schools cannot be included within said definition. The issue is clarified in the text of the statute above. A charter school may limit its admissions. They are not required to educate **every** child eligible for admission because they are outside the regulatory scope of the local school district, KRS 160.1592(1), which is required to educate every child. *See* KRS 158.030. Charter schools are not required to answer to local school districts nor be accountable to them in any way; therefore, they are outside of their scope. Being outside of the scope of the requirement of the statutory definition of the common school system, charter schools fail to meet the definition required of a common school. Common ("public") schools, on the contrary, must be available to educate **every** eligible child within their district and may not establish enrollment caps.

8

In defending HB 9, the Appellants articulated students will return to their local school districts (return to their common "public" school) if there is not room in the charter school. This is not sufficient to bring charter schools within the system itself. If a child does not get into a religious or private school, they, too, return to their local school district. This default mechanism that occurs does not satisfy being *within* the system.

Additionally, the premise relied upon by Appellants that every student may apply and fairness of admissions will be ensured by the lottery[5] process fails to correct this constitutional error. Charter schools provide the maximum enrollment per grade per year in their initial application as required by statute. KRS 160.1593(3)(m). When the demand for charter schools outweighs the supply, a lottery system will be put into place to ensure "fairness" in the admissions process. KRS 160.1591 (emphasis added). In fact, KRS 160.1594(2), which encourages charter school authorizers to give *preference* to certain targeted applications, provides proof that at least the initial enrollment process will not be admitted on an open basis. Enrollment preferences may be given to children of the charter school's board of directors and full-time employees. Once students are enrolled, they have the benefit of priority re-enrollment status, as do siblings. If capacity is eventually reached, the priority-enrollment status structure would naturally prohibit any meaningful lottery entrance. Even if the lottery process is invoked before any priority status is

---

[5] KRS 160.1590(14)(f) allows for a lottery system to fill seats when more students apply than there are open seats.

9

given, nevertheless, it still remains that some children will not "ha[ve] the privilege of attending it" because the cap exists (a cap the local school district has no control over). KRS 158.030(1).

Finally, Appellant LaFontaine argues that charter schools are "potentially *more* 'available to all' than conventional schools, because *all* parents and guardians can undertake to start such a school on their own," whereas conventional schools "can only be started by a local board." This overly simplistic view not only overlooks the authorizer's role in approving charter schools, the practical limitations of a parent's ability and time, and the immense task of upstarting a school, but also confuses the language of KRS 158.030(1).

To clarify the statute, we turn to Black's Law Dictionary. The definition of the word "school" is broken down to define a "public school" as "an elementary, middle, or high school established under state law, *regulated by the local state authorities in the various political subdivisions*, funded and maintained by public taxation, and open and free to all children of the particular district where the school is located." *School — Public School*, BLACK'S LAW DICTIONARY (8th ed. 2007). Those local authorities in the various political subdivisions tasked with regulating public schools are called school districts.[6]

---

[6] A school district is defined as "a political subdivision of a state, created by the legislature and invested with local powers of self-government, to build, maintain, fund, and support the public schools within its territory and to otherwise assist the state in administering its educational responsibilities." *School District*, BLACK'S LAW DICTIONARY, (8th ed. 2007).

Thus, the definition of public school is a school established by law, regulated by local state authorities in school districts, funded by taxes, and open and free to all children residing in that geographical district. Charter schools, by statute, are not regulated by local state authorities in school districts, are not regulated by the rules set out by the state authorities for schools, even if excluded from school districts[7], and therefore they are not a common school under Sections 183 and 184 of the Kentucky Constitution.

**B. Outside the Common School System**

The lack of public oversight is not merely relevant for the statutory definition of "common schools," oversight is also pertinent to the Constitution's definition and interpretation. "Common schools shall be monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence." *Rose*, 790 S.W.2d at 213. Setting up an entire alternative system outside the common schools is not the same as monitoring the existing common schools. Appellant LaFontaine argues that the charter schools remain accountable because the General Assembly itself, as creator of the scheme, is accountable "the same way local boards are" (presumably, through the electoral process — voters can reflect displeasure at the voting box). He further argues that charter schools are also held accountable through measures designed to ensure they are

---

[7] Charter schools "shall be exempt from administrative regulations governing public schools for purposes of zoning and local land use regulation." KRS 160.1592(13).

11

reporting transparently, through oversight by the authorizer, and because charter schools' vitality depends on competing for students. But none of these answer how charter schools remain accountable *to* the General Assembly. The only entities which can authorize the creation of a charter school or operate, oversee, and monitor the school once it has been established, are not necessarily accountable to the General Assembly. Although there are provisions to ensure achievement data is released regularly to the public, there is no specific provision ensuring reliability of the data, no independent body to interpret said data, nothing requiring the General Assembly to respond to unfavorable data, nor to remedy indications of waste, duplication, mismanagement, or political influence if indications of such make it into the data. The entities tasked with overseeing charter schools are authorizers, who may be either "[a] local school board of a local school district," "[a] collaborative among local school boards," "[t]he mayor of a consolidated local government," or "[t]he chief executive officer of an urban-county government." KRS 160.1590(15). First, these people must agree to become authorizers. Second, each of these positions are generally elected positions, not hirable, fireable, or otherwise accountable to the General Assembly. Nothing in the statutes or regulatory scheme proves that the proposed charter school system would be effectively "monitored by the General Assembly to assure that they are operated with no waste, no duplication, no mismanagement, and with no political influence" as required by *Rose*, 790 S.W.2d at 213. Therefore, in accordance

12

with our precedent, the proposed charter schools fall outside of Kentucky's constitutional common school system classification.

In contrast, public schools are monitored by the General Assembly through its Office of Education Accountability, which "[m]onitors the elementary and secondary public education system, including actions taken and reports issued by the Kentucky Board of Education, the Education Professional Standards Board, the Commissioner of Education, the Department of Education, and local school districts."  KRS 7.410(2)(c)(1.).  The Office of Education Accountability also "[i]nvestigate[s] allegations of wrongdoing of any person or agency, including but not limited to waste, duplication, mismanagement, political influence, and illegal activity at the state, regional, or school district level."  KRS 7.410(2)(c)(4.).  Yet, KRS 160.1592(1), which states,

> [a] public charter school shall be . . . **exempt** from all statutes and administrative regulations applicable to the state board, a local school district, or a school, except the public charter school shall adhere to the same health, safety, civil rights, and disability rights requirements as are applied to all public schools and to all requirements otherwise identified in KRS 160.1590 to 160.1599 and 161.141

excludes charter schools from this oversight.  And, while it is true that the General Assembly could enact legislation to repeal charter schools as a whole, they have limited, if any, ability to effectively target individualized failings, if the General Assembly is made aware of any failings at all.  Because the statute creates and allows charter schools to play by a second rulebook while remaining publicly funded, **a non-uniform parallel system is created**. Our precedent as stated in *Rose,* requires the system to be "unitary and uniform"

13

and not duplicative. It does not allow for a parallel system which is not within the common school system. A system that calls itself "public" must be accountable to the public. Simply putting the label "public" on something does not make it such. Charter schools are not "common schools" as contemplated under Sections 183, 184, and 186 of the Kentucky Constitution, and funding a second, complete, and parallel system triggers the mandate of constitutional financial protection.

### III. UNIQUELY KENTUCKY

In the 19th century, Kentucky's "Literary/School Fund" drew income from bank stock and other sources which lawmakers repeatedly diverted to non- K-12 purposes. The level of restriction was heavily debated between the delegates with delegate Bronston stating:

> Do you want, at this late date in the State of Kentucky, to say that you will not make another provision for a blind asylum for the education of those unfortunates without submitting it to a popular vote? Do you want to say that those institutions, which were built without being submitted to a popular vote shall be stricken down, and that no longer shall the feeble-minded be educated without submitting it to a popular vote?
> Will you go further, and say that you will no longer undertake to educate the deaf and dumb without submitting it to a popular vote, merely to gratify feeling of spite and envy on the part of a certain class of people that have, from the very origin of Kentucky as a State, been fighting higher education in Kentucky by the State?

Debates, Constitutional Convention, 1890, Vol. III, p. 4494.

Interestingly, the delegates proceed to discuss how private entities have been battling against the concept of a common ("public") school since its inception.

14

You know very well its history after this attempt. There was an effort made to build up a common school system, and you know very well what became of it. A Legislature met and said that internal improvements were more important than education, and they actually burned up the bond and appropriated all the money to internal improvements; dissipated the whole system which had required years to build up.

*Id.* at p. 4497.

So it was amidst this pilfering landscape that our constitution made the school fund inviolable and for the sole purpose of common school education and "no other purpose." Intentionally forcing democratic consent for anything outside the common schools, the framers also carved out an extremely narrow, named exception for the then-existing Agricultural and Mechanical College, underscoring how tightly they drew the rule.

Because Kentuckians in 1890–91 deliberately "locked up" K–12 money in the Constitution after decades of raids, diversions, and political fights over spending dollars on things other than local public ("common") schools, the difference has become highlighted only recently as neighboring states, without such a provision as Kentucky, by contrast, use a broad mandate to "provide a system of free/common schools" in their constitutions. *See, e.g.*, OHIO CONST. ART IV §2, TENN. CONST. ART. XI §12, W.VA. CONST. ART. XII §1. Most other states' definitions of common school are the baseline minimalist approach of "free."[8]

---

[8] Many states created "school funds" but few embedded an explicit, voter-approval trigger for spending outside the common ("public") school system. That is why Kentucky neighbors can authorize charters (or even vouchers in some cases) by

15

This protection has been consistent and began the very next year with preventing the sectarian diversions of funds to private schools in *Underwood v. Wood*, 19 S.W. 405, 407 (Ky. 1892). The Court of Appeals, then Kentucky's highest court, blocked transportation for local students to schools other than the "common" public schools in *Sherrard v. Jefferson County Board of Education*, 171 S.W.2d 963, 967 (Ky. 1942), and refused to treat a children's-home school, not open to all, as a common school in *Hodgkin v. Board for Louisville & Jefferson County Children's Home*, 242 S.W.2d 1008, 1010 (Ky. 1951). Even indirect mechanisms such as tax-credit schemes cannot violate this protection when this Court reaffirmed Section 184's plain financial standard that defines "common schools" as public K-12 schools and barred the raising or collecting sums for education other than for common schools absent a voter-approved tax in *Johnson*, 658 S.W.3d at 36. Consistent protection of the common school educational finances differentiates the very essence of the Kentucky Constitution. So, perhaps the additional question for the constitutional analysis is how do charter schools distinguish themselves financially from common schools such that this Court has found them to be constitutionally infirm?

While the advocates of charter schools tout their "many similarities" regarding testing and teacher certification, it is the silence, or the exemptions, that speaks volumes. Charter schools may purchase buildings with state tax

ordinary statute unless their own constitutions say otherwise while Kentucky's language is uniquely specific and fiscal.

16

dollars, but those buildings are not assets of the school district or Kentucky Department of Education. KRS 160.1592(3)(p)(7). A charter school has no obligation to provide extracurricular activities or access to facilities for students enrolled in the charter school, and if they don't offer those interscholastic athletic opportunities, those students "shall be eligible to participate at the school the student would attend based on the student's residence" because those local public schools are required to offer athletic opportunities and are now required to include students whose public tax dollars go elsewhere. KRS 160.1592(18)(c)-(d). A public school teacher must be given a "leave of absence" by his or her existing public school employer to go to work at a charter school, highlighting they are not part of the common school system. KRS 160.1952(22). Under the charter school regulations, the local public school district board must provide publication and advertising for the charter schools "through the same means" it provides information about public schools, a burden without funding to support it. KRS 160.1592(5). The fiscal guardrails were erected by our framers to stop diversions from the pool of resources dedicated to public education and those guardrails continue to protect it today, preventing diversions via funding mechanisms.

The statutory examples illustrated above make clear the repeated dilution of public school funding of resources that would occur under the proposed parallel system. From *Underwood* through *Sherrard*, public (free), district-governed schools, open to all, taught by qualified teachers, maintained under the statutory system, are common schools and not private or nonpublic

17

dressed in public clothes. *Underwood,* 19 S.W. at 406; *Sherrard,* 171 S.W.2d at 966. *Hodgkin* told us the legislature cannot transform a non-common school into a common school by relabeling it. 242 S.W.2d at 1009. The constitutional sequence requires text first (Section 184's lockbox); tradition next (the public, district-run meaning of "common schools"); mechanism last (how the money flows). To start with a preferred mechanism and hunt for a saving label distorts and perverts the process.

In *Fannin v. Williams*, a statute similarly tried to avoid constitutional infirmity by a creative workaround. 655 S.W.2d 480, 484 (Ky. 1983). Nonpublic school administrators were responsible for the custody, use, and return of books purchased by the Department of Libraries and distributed to pupils. Schools outside the common school system would have received items bought with public education funding. Ultimately, though, the limitation upon legislative power to expend money for education other than in common schools was strengthened. Precedent is strong and consistent. "We cannot sell the people of Kentucky a mule and call it a horse, even if we believe the public needs a mule." *Johnson,* 658 S.W.3d at 36 (*citing Fannin,* 655 S.W.2d at 484). Innovation is welcome; circumvention is not.

Because we find that HB 9 violates Sections 183, 184 and 186 of the Kentucky Constitution, we need not reach the parties' other arguments on appeal.

We understand the significant nature of today's holding. It is clear that the General Assembly has exerted substantial effort in curating a scheme to

18

establish a system of schools it anticipated would be effective. It is likewise clear that Appellants believe strongly that charter schools would benefit the education of children across the Commonwealth. The foregoing was not a discussion about whether the proposed charter schools would be constitutionally "efficient." We make no predictions about the potential success of charter schools or their ability to improve the education of the Commonwealth's children, and we leave public policy evaluations to the Commonwealth's designated policy makers — the General Assembly. Our holding today is based solely on the unconstitutionality of HB 9. We do, however, note that the People, acting through the legislature, are not without redress. Section 184 of the Kentucky Constitution provides an avenue for funding charter schools should a majority of voters be convinced that charter schools are for the betterment of efficient, effective education for all Kentuckians. Nevertheless, the Constitution as it stands is clear that it does not permit funneling public education funds outside the common public school system.

## IV. CONCLUSION

For the foregoing reasons, HB 9 violates the mandates of Sections 183, 184, and 186 of the Kentucky Constitution. Accordingly, we affirm the Franklin Circuit Court.

All sitting. All concur. Lambert, C.J., also concurs by separate opinion which Thompson, J., joins.

19

LAMBERT, C.J., CONCURRING: Our North Star is the Constitution of this Commonwealth. The drafters of our Constitution included very strong and unequivocal provisions that place barriers around the powers otherwise granted to the General Assembly regarding public education of our children. Does that mean that Kentucky is forever limited to our current educational structure? No. But it does mean that if our common and public educational system is going to be altered in the way directed by these statutes, that alteration must come in the form of a constitutional amendment.

Thus, I agree with the Majority's conclusion that HB 9 violates §§ 183, 184, and 186 of the Kentucky Constitution by permitting monies from the common school fund to support charter schools, which are outside our system of common schools, without first submitting that practice to the voters for approval. I write separately to highlight some additional concerns to point out that, through this legislation, the General Assembly has ceded its constitutional authority to oversee the public schools to authorizers, and to emphasize that the charter schools are not unitary.[9]

First, KRS 160.15911 of HB 9 establishes the "Kentucky Public Charter School Pilot Project" (pilot project), the purpose of which is "to study the impact of public charter schools within the common school system." KRS 160.15911(1). It further explicitly states, in relevant part, that

---

[9] "Unitary" is defined as: "Of, relating to, or involving a system of government that effects a union that fuses the governmental organs, without any division between regional components and the national components of a central government." *Unitary*, BLACK'S LAW DICTIONARY (12th ed. 2024).

20

(2) Authorizers for the pilot project shall include:

    (a) A school board of a county school district located in a county with a consolidated local government, which shall have authorizing jurisdiction within the territory of the district's boundaries; and

    (b) Notwithstanding KRS 160.1590, the board of regents of Northern Kentucky University, which shall have authorizing jurisdiction within any county containing four (4) or more local school districts.

"Authorizer" is defined by HB 9 as "an entity or body that reviews, approves, or denies charter applications, enters into charter contracts with applicants, oversees public charter schools, and renews, does not renew, or revokes charter contracts." KRS 160.1590(15). Thus, authorizers for the pilot project must either be: "[a] school board of a county school district located in a county with a consolidated local government[]" or "the board of regents of Northern Kentucky University," which will only have "authorizing jurisdiction within any county containing four (4) or more local school districts." KRS 160.15911(2).

The only county in the Commonwealth that is currently has a consolidated local government is Jefferson County, and the only counties currently containing four or more local school districts are Campbell and Kenton Counties. Ergo, the pilot project would only be implemented in Jefferson County, Kenton County, and Campbell County and cannot be implemented in any of Kentucky's remaining 117 counties. This is further proof that HB 9 violates our Constitution's mandate, as interpreted by *Rose v. Council for Better Education, Inc.*, that "[t]he essential, and minimal, characteristics of an 'efficient' system of common schools" includes that

21

"[c]ommon schools shall be available to **all** Kentucky children." 790 S.W.2d 186, 212 (Ky. 1989). The school system must be provided throughout the entire state: "'. . . It is a system of practical equality in which the children of the rich and the poor meet upon a perfect level and the only superiority is that of the mind.'" *Id.* at 205 (quoting the comments of Delegate Beckner on the report which led to the selection of the language in Section 183).

Next, KRS 160.1592(1) directs that

> A public charter school shall be part of the state's system of public education **but shall be exempt from all statutes and administrative regulations applicable to the state board, a local school district, or a school**, except the public charter school shall adhere to the same health, safety, civil rights, and disability rights requirements as are applied to all public schools and to all requirements otherwise identified in KRS 160.1590 to 160.1599 and 161.141.

(Emphasis added). While the same statute also provides that

> (3) A public charter school shall:
>
> . . .
>
>> (p) As a public body corporate, have all the powers necessary for carrying out the terms of its charter contract, including the power to:
>>
>> . . .
>>
>> 7. Acquire real property for use as its facility or facilities, from public or private sources[.]

KRS 160.1592(3). What, then, would prevent a school operator, acting in bad faith, from misappropriating our public tax dollars perhaps, for example, by purchasing a shoddy building or acting in some self-dealing fashion? What would happen if, perhaps to draw students from other area schools, a charter

22

school operator decided to build a very expensive building and thus over-expend state tax dollars.

The possibility of this eventuality is particularly troubling when one considers that there is no means of public oversight of a charter school for at least five years.[10] KRS 160.1597 directs that "[u]pon the approval of a charter contract by a public charter school authorizer, the applicant shall be permitted to operate a public charter school for a term of five (5) years[,]" and that "[t]he board of directors of the public charter school **shall have final authority** over policy and operational decisions of the public charter school, although the decision-making authority may be delegated to the administrators and staff of the school in accordance with the provisions of the charter contract." KRS 160.1597(1), (6) (emphasis added). At the end of a charter school's initial five-year term, "[a] charter contract may be renewed by the authorizer for a term of duration of five (5) years[.]" KRS 160.1598(1). An authorizer, in turn, may be "[a] local school board of a local school district"; "[a] collaborative among local school boards"; "[t]he mayor of a consolidated local government"; or "[t]he chief executive officer of an urban-county government[.]" KRS 160.1590(15).

Thus, it appears that the only avenue to provide public oversight of a charter school that is mismanaging public funds or is otherwise acting in a manner we would not accept of our public schools is to refuse to approve its application for renewal at the end of a five-year period; and even that action is

---

[10] I acknowledge that an application for *renewal* "may vary the term to as few as three (3) years." KRS 160.1598(1).

not taken by the General Assembly itself, but rather by one of four publicly elected bodies or officials. This too violates our Constitution as interpreted by *Rose*, where this Court plainly stated that part of providing an efficient system of common schools requires "the **General Assembly**" to "not only establish the system, but. . . monitor it **on a continuing basis** so that it will always be maintained in a constitutional manner. The General Assembly **must carefully supervise** it, so that there is no waste, no duplication, no mismanagement, at any level." *Rose*, 790 S.W.2d at 211 (emphasis added).

> If they choose to delegate any of this duty to institutions such as the local boards of education, the General Assembly must provide a mechanism to assure that the ultimate control remains with the General Assembly, and assure that those local school districts also exercise the delegated duties in an efficient manner.

*Id*. at 216.

At bottom, the system of statewide charter schools the General Assembly desired to implement via HB 9 could have been constitutionally valid if it had been successfully submitted to the voting public. KY. CONST. § 184 ("No sum shall be raised or collected for education other than in common schools until the question of taxation is submitted to the legal voters, and the majority of the votes cast at said election shall be in favor of such taxation[.]"). Under the state constitution, the only path forward is to submit the issue to a referendum, with a majority of voters required to loosen the very strict requirements for an adequate, uniform and unitary public school system paid for by state tax dollars.

Thompson, J., joins.

24

COUNSEL FOR APPELLANT/CROSS-APPELLEE, COMMONWEALTH OF KENTUCKY, EX REL. ATTORNEY GENERAL RUSSELL COLEMAN:

John H. Heyburn
Matthew F. Kuhn
Sarah N. Cohen
Aaron J. Silletto
Christopher L. Thacker
Office of Attorney General

COUNSEL FOR APPELLEE/CROSS-APPELLANT, GUS LAFONTAINE:

Paul E. Salamanca

COUNSEL FOR APPELLEES/CROSS-APPELLEES, COUNCIL FOR BETTER EDUCATION; DAYTON INDEPENDENT BOARD OF EDUCATION; AND JEFFERSON COUNTY BOARD OF EDUCATION:

Byron Edward Leet
Sean G. Williamson
Mitzi Denise Wyrick
Wyatt Tarrant & Combs LLP

COUNSEL FOR APPELLEES/CROSS-APPELLEES, KENTUCKY BOARD OF EDUCATION; ROBIN FIELDS KINNEY, IN HER OFFICIAL CAPACITY AS INTERIM COMMISSIONER OF THE KENTUCKY DEPARTMENT OF EDUCATION; AND SHARON PORTER ROBINSON, IN HER OFFICIAL CAPACITY AS CHAIR OF THE KENTUCKY BOARD OF EDUCATION:

Todd G. Allen
Donald J. Haas
Kentucky Department of Education

COUNSEL FOR AMICUS CURIAE, REVEREND WALTER JONES III:

August S. Herbert
Dennis David Murrell
Gray Ice Higdon, PLLC

COUNSEL FOR AMICUS CURIAE, KENTUCKY CENTER FOR ECONOMIC POLICY:

Pamela J. Thomas

COUNSEL FOR AMICUS CURIAE, BLUEGRASS INSTITUTE FOR PUBLIC POLICY SOLUTIONS, INC.

Glenn Lukus Burton
Squire Patton Boggs (US) LLP